Marshall, Ch. J.
(dissenting.) — I entirely concur in so much of the opinion delivered in this case, as attaches a hostile character to the property of an American citizen continuing, after the declaration of war, to reside and trade in the country of the enemy ; and I subscribe implicitly to the reasoning urged in its support. But from so much of that opinion as subjects to confiscation the property of a citizen, shipped before a knowledge of the war, and which disallows the defence founded on an intention to change his domicil and to return to the United States, manifested in a sufficient manner, and within a reasonable time after knowledge of the war, although it be subsequent to the capture, I feel myself compelled to dissent. The question is undoubtedly complex and intricate. It is difficult to draw a line of discrimination *184 which shall be at the same time precise and equitable. But the difficulty does not appear to me to be sufficient to deter courts from making the attempt.
A merchant residing abroad for commercial purposes may certainly intend to -continue in the foreign country, so long as peace shall exist, provided his commercial objects shall detain him so long, but to leave it the instant war shall break out between that country and his own. This intention, it is not necessary to manifest during peace ; and when war shall commence, the belligerent cruizer may find his property on the ocean, and may capture it, before he knows that Avar exists. The question, whether this be enemy property or not, depends, in my judgment, not exclusively on the residence of the OAvner at the time, but on his residence, taken in connection with his national character as a citizen, and with his intention to continue or to discontinue his commercial domicil in the event of war. *The evi- p,. dence of this intention will rarely, if ever, be given during peace. It L must, therefore, be furnished, if at all, after the war shall be knoAvn to him; and that knowledge may be preceded by the capture of his goods. It appears to me, then, to be a case in which, as in many others, justice requires that subsequent testimony shall be received to prove a pre-existing fact. Measures taken for removal, immediately after a Avar, may prove a previous intention to remove, in the event of war, and may prove that the captured property, although, primó, facie, belonging to an enemy, does, in fact, belong to a friend. In such case, the citizen, in my opinion, has a right, in the nature of thv jus postliminii, to claim restitution.
As this question is not only decisive of many claims now depending before this court, but is also of vast importance to our merchants generally, I may be excused for stating, at some length, the reasons on which my opinion is founded.
The Avhole system of decisions' applicable to this subject, rests on the law of nations as its base. It is, therefore, of some importance to inquire how far the writers on that law consider the subjects of one power, residing within the territory of another, as retaining their original character, or partaking of the character of the nation in which they reside.
Vattel, Avho, though not very full to this point, is more explicit and more satisfactory on it than any other whose work has fallen into my hands, says, “the citizens are the members of the civil society ; bound to this society by certain duties, and subject to its authority, they equally participate in its advantages. The natives, or indigenes, are those born in the country, of parents who are citizens. Society not being able to subsist and to perpetuate itself but by the children of the citizens, those children naturally follow the condition of their fathers, and succeed to all their rights. The inhabitants, as distinguished from citizens, are strangers who are permitted to settle and stay in the country. Bound by their residence to the society, they are. subject to the laws of the state, while they reside there, and they are obliged to defend it, because it grants *them pro- r*qao tection, though they do not participate in all the rights of citizens. L They enjoy only the advantages which the laws, or custom gives them. The perpetual inhabitants are those Avho have received the right of perpetual residence. These are a kind of citizens of an inferior order, and are united and subject to the society, without participating in all its advantages; *185 The domicil is the habitation fixed in any plaoe, with an intention of always staying there. A man does not, then, establish his domicil in any place, unless he makes sufficiently known his intention of fixing there, either tacitly or by an express declaration. However, this declaration is no reason why, if he afterwards changes his mind, he may not remove his domicil elsewhere. In this sense, he who stops, even for a long time, in a place, for the management of his affairs, has only a simple habitation there, but has no domicil.”
A domicil, then, in a sense in which this term is used by Yattel, requires not only actual residence in a foreign country, but “an intention of always staying there.” Actual residence without this intention amounts to no more than “simple habitation.” Although this intention maybe implied, without being expressed, it ought not, I think, to be imjfiied, to the injury of the individual, from acts entirely equivocal. If the stranger has not the power of making his residence perpetual, if circumstances, after his arrival in a country, so change, as to make his continuance there disadvantageous to himself, and his power to continue, doubtful; “ an intention always to stay there ” ought not, I think, to be fixed upon him, in consequence of an unexplained residence previous to that change of circumstances. Mere residence, under particular circumstances, would seem to me, at most, to prove only an intention to remain so long as those circumstances continue the same, or equally advantageous. This does not give a domicil. The intention which gives a domicil is an unconditional intention “to stay always.”
- The right of the citizens or subjects of one country to remain in another, *2911 c^ePen<^s on th® will of the sovereign *of that other ; and if that will -1 be not expressed otherwise than by that general hospitality which receives and affords security to strangers, it is supposed to terminate with the relations of peace between the two countries. When war breaks out, the subjects of one belligerent in the country of the other are considered as enemies, and have no right to remain there. Yattel says, “ enemies continue such wherever they happen to be ; the place of abode is of no account here; it is the political ties which determine the quality. While a man remains a citizen of his own country, he remains the enemy of all those with whom his nation is at war.”
It would seem to me, to require very strong evidence of an intention to become the permanent inhabitant of a foreign country, to justify a court in presuming such intention to continue, when that residence must expose the person to the inconvenience of being considered and treated as an enemy. The intention to be inferred solely from the fact of residence, during peace, for commercial purposes, is, in my judgment, necessarily conditional, and dependent on the continuance of the relations of peace between the two countries. So far as the law of nations from considering residence in a foreign country, in time of peace, as evidence of an intention “ always to stay there,” even in time of war, that the very contrary is expressed. Yattel says, “ the sovereign declaring war can neither detain those subjects of the enemy who are within his dominions at the time of the declaration, nor their effects. They came into his country on the public faith; by permitting them to enter his territory and to continue there, he tacitly promised them liberty and security for their return. He is, therefore, to allow them a reasonable time for withdrawing with their, effects; and if they stay beyond *186 the time prescribed, he has a right to treat them as enemies, though as enemies disarmed.”
The stranger merely residing in a country, during peace, however long his stay, and whatever his employment, provided it be such as strangers may engage in, cannot, on the principles of national law, be considered *as incorporated into that society, so as, immediately on a declaration ¡-*009 of war, to become the enemy of his own. “His property,” says *- Vattel, “ is still a part of the totality of the wealth of his nation.” “The citizen or subject of a state, who absents himself for a time, without any intention to abandon the society of which he is a member, does not lose his privilege by his absence ; he preserves his rights, and remains bound by the same obligations. Being received in a foreign country, in virtue of the natural society, the communication and commerce, which nations are obliged to cultivate with each other, ho ought to be considered there as a member of his own nation, and treated as such.”
The subject of one power inhabiting the country of another, ought not to be considered as a member of the nation in which he resides, even by foreigners ; nor ought he, on the first commencement of hostilities, to be treated as an enemy by the enemies of that nation. Burlamaqui says, “ as to strangers, those whe settle in the enemy’s country, after a war is begun, of which they had previous notice, may justly be looked upon as enemies, and treated as such. But in regard to such as went thither before the war, justice and humanity require that we should give them a reasonable time to retire ; and if they neglect that opportunity, they are accounted enemies.” If this rule be obligatory on foreign nations, much more ought it to bind that of which the individual is a member.
I think, I cannot be mistaken, when I say that, in all the views taken of this subject by the most approved writers on the law of nations, the citizen of one country, residing in anothex-, is xxot considered as incorporated in that othex-, but is still considered as belonging to that soe:ety of which he was originally a member. And if war break out between the two nations, he is to be permitted, and is expected, to return to his own. I do xxot perceive in those writers any exception with regard to ixxei'clxaxxts.
It must, however, be acknowledged, that the great extension *of ' ,¡¡293 commerce has had considex-able influence on xxational law. Rules *- have been adopted, perhaps, by general consent, principles have been engrafted on the original stalk of public law, by which merchants, while belonging politically to one society, are considered commercially as the members of anotlxex-. For commercial purposes, the mex-chaxxt is considered as a member of that society in which he has his domicil; and less conclusive evidence than would seem to be required in general cases, by the law of nations, has been allowed to fix the domicil for commex-cial purposes. But I cannot admit, that the original meaning of the tex-m is to be entirely disregai-ded, or the true nature of this domicil to be overlooked. The effects of the rule ought to be regulated by the motives which are presumed to have induced its establishment, and by the convenience it was intended to px-omote.
The policy of commercial nations x-eceives fox-eign merchants into their bosom ; and pex-mits their own citizens to reside abx;oad for the pux-poses of tx-ade, without injury to their rights or character as citizens. This free *187 intercommunication must certainly be believed, by the nations who allow it, to be promotive of their interests. Nor is this opinion ill founded. Nothing can be more obvious, than that the affairs of a commercial company will be transacted to most advantage, by being conducted, as it respects both purchase and sale, under the eye of a person interested in the result. The nation which takes an interest in the prosperity of its commerce, can feel no inclination to restrain its citizens from residence abroad, for the purposes of commerce ; nor will it hastily construe such residence into a change of national character, to the injury of the individual. It is not the policy of such a nation, nor can it be its wish, to restrain its citizens from pursuing abroad a business which tends to enrich itself. It ought not, .then, to consider them as enemies, in consequence of their having engaged in such pursuit, in the country of a friend, who, before their removal, becomes an enemy.
If, indeed, it be the real intention of the citizen, permanently to change his national character, if it be his choice to remain in the country of the *2941 enemy! during *war, there can be no harshness, no injustice, in treat-J ing him as an enemy. But if, while prosecuting his business in a foreign country, he conteinplates a return to his own ; if, in the prosecution of that business, he is promoting rather than counteracting the interests and policy of the country of which he is a member, it would seem to me, to be pressing the principle too far, and to be drawing conclusions which the premises will not warrant, to infer, conclusively, an intention to continue in a country which has become hostile, from a residence and trading in that country, while it was friendly; and to punish him by the confiscation of his goods, as if he was fully convicted of that intention.
It is admitted to be a general rule, that, while the state of things remains unaltered, while the motives which carried the citizen abroad continue, while he still prosecutes a business of uncertain duration, his capacity to prosecute which is not impaired, his mercantile character is confounded with that of the country in which he resides, and his trade is considered as the trade of that country. It will require but a slight examination of the subject, to perceive the reason of this rule; and that, to a certain extent, it is convenient, without being unjust.
In times of universal peace, the question of national character can arise only when some privilege or some disability is attached to it, or in eases of insurance. A particular trade may be allowed, or be prohibited, to the merchants of a particular nation, or property may be warranted to be of a particular nation. If, in such cases, the residence of the individual be received as Evidence of his national mercantile character, the subjects of inquiry are simplified, the questions are reduced to a plain one, and the various complex inquires, whicli might otherwise arise, are avoided. There is, therefore, much convenience in adopting this principle, in such a state of things ; and it is not perceived, that any injustice can grow out of it; since the individual to whom the rule is applied, is not surprised by any new or unlooked-for event.
*2951 So, if war exists between two nations. Each belligerent *having J a right to capture the property of the other, found on the- ocean, each being intent on destroying the commerce of the other, and on depriving it of every cover under which it may seek to shelter itself, will *188 certainly not allow the advantages of neutrality to a merchant residing in the country of his enemy. Were this permitted, the whole trade of the enemy could assume, and would assume, a neutral garb.
There is, in general, no reason for supposing that a merchant residing' in a foreign country, and can-ying on trade, means to withdraw from it, oh its engaging in war with any other country to which he is bound by no obligation. By continuing, during war, the domicil acquired in peace, he violates no duty, offends against no generally acknowledged principle, and retains all his rights of residence and commerce. The war, then, furnishes no motive for presuming that he is about to change his situation, and to resume his original national character.
These reasons appear to me to require the rule as a general one, and to justify its application to general cases. But they do not, in my opinion, justify its application to the case of a merchant whom war finds engaged in trade in a country which becomes the enemy of his own. His country ought not, I think, to bind Mm by his residence during peace ; nor to consider him as precluded by it from showing an intention that if should terminate with the. relations of peace.
When it is considered, that his right to remain and prosecute that trade in which he had been engaged during peace, is forfeited; that his duty, and most probably, Ms inclinations, call him home; that he has become the enemy of the country in which he resides; that his continuance in it exposes Mm to many and serious inconveniences ; that his person and property are in danger ; it is not, I think, going too far, to say, that this change in his situation may be considered as changing his intention on the subject of residence, and as affording a presumption of intending to return.
Let it be remembered, that, according to the law of nations, domicil depends on the intention to reside permanently *in the country to pong which the individual has removed ; and that a change of this inten- L tion is, at any time, allowable. If, upon grounds of general policy and general convenience, while the circumstances under which the residence commenced, continue the same, residence and employment in permanent trade be considered as evidence of an intention to continue permanently in the country, and as giving a commercial national character, may not a total change in circumstances — a loss of the capacity to carry on the trade — be received, in the absence of all conflicting proof, as presumptive evidence of an intention to leave the country, and as extricating the trade, carried on in the time of supposed peace, from the national character, so far as to protect it from the perils of war ? At any rate, do not reason and justice require that this change of circumstances should leave the question open, to be decided on such other evidence as the war must produce ? ,"
The great object for which an American merchant fixes himelf in a 'foreign country, is, most generally, to carry on trade between that country and his own. In almost every case of this description, before the court, the claimant is a member of a house established in the United States ; and Ms business abroad is subservient to the business at home. This trade[1] is annihilated by the war.
If, while peace subsists between the United States and' Great Britain, while the American merchant possesses there all the commercial rights *189 allowed to the citizens of a friendly nation, and may carry on, uninterruptedly, his trade to his own country, he is presumed, his intentions being unexplained, to intend remaining there always, and may, for general convenience, be clothed with the commercial character of the nation in which he resides, ought this presumption to be extended, by his own government, beyond the facts out of which it grows, if the interest of the individual be materially affected by that extension ? Do not reason and justice require, that we should consider his original intention as being only co-extensive with the causes which carried him to and detained him in the country, as being, in its nature, conditional, and dependent on the continuance of those causes ? *2Q'7l such a person were required, on his arrival in a foreign country, to declare his real intentions on the subject of residence, he would, most probably, say, if he spoke honestly, “ I come for the purpose of trade.: I shall remain while the situation of the two countries permits me to cany on my trade lawfully, securely, and advantageously : when that situation so changes as to deprive me of these rights, I shall return.” His intention, then, to reside in the country, his domicil in it, and consequently, his commercial character, unless he continued his trade after war, would be clearly limited by the duration of peace. It would not, I think, be unreasonable to say, that the intention, to be implied from his conduct, ought to have the same limitation.
To me, it seems, that a mere commercial domicil, acquired in time of peace, necessarily expires, at the commencement of hostilites. Domicil supposes rights incompatible with a state of war. If the foreign merchant be not compelled to abandon the country, it is not because his commercial character confers on him a legal right to stay, but because he is especially permitted to stay. If, in this, I am correct, it would seem to follow, that, if all the legal consequences of a residence in time of peace do not absolutely terminate with the peace, yet the national commercial character which that residence has attached to the individual, is not so conclusively fixed upon him, as to disqualify him from showing, that, within a reasonable time after the commencement of hostilities, he made arrangements for returning to his own country. If a residence and trading, after the war, be not indispensably necessary to give the citizen merchant, or his property, a hostile character, yet removal, or measures showing a determination to remove, within a reasonable time after the war, may retroaet upon property shipped before a knowledge of the war, and rescue that property from the hostile character attached to the property of the nation in which the individual resided.
The law of nations is a law founded on the great and immutable principles of equity and natural justice. . To draw an inference against all probability, whereby, a citizen, for the purpose of confiscating his goods, ■ is clothed, against his inclination, with the character of an enemy, in conse- * fiuence °f an act which, when committed, *was innocent in itself, -* was entirely compatible with his political character as a citizen, and with the political views of his government, would seem to me to subvert those principles. The rule which, for obvious reasons, applies to the merchant, in time of peace or in time of war, the national commercial character of the country in which he resides, cannot, in my opinion, without 'subverting those principles, apply a hostile character to his trade carried on during *190 peace so conclusively as to prevent his protecting it, by changing that character, within a reasonable time after a knowledge of the war.
My opinion, then, is, that a mere commercial domicil, acquired by an American citizen in time of peace, especially, if he be a member of an American house, and is carrying on trade auxiliary to his trade with his own country, ought not to be considered positively as continuing longer than the state of peace. The declaration of war is a fact which removes the causes that induced his residence in the foreign country : they no longer operate upon him. When they cease, their effects ought to cease : an intention which they produced, ought not to be supposed to continue. The character of his property shipped before a knowledge of the war, ought not to be decided absolutely by his x-esidence at the time of shipment or capture, but ought to depend on his continuing to reside and trade in the enemy country, or on his taking prompt measures for returning to his own.
This is the conclusion to which my mind would certainly be conducted, might I permit.it to be guided by the lights of reason and the principles of natural justice. But it is said, that a course of adjudications has settled the law to be otherwise ; that we cannot, without overturning a magnificent system, bottomed on the broad base of national law, and of which the parts are admirably adjusted to each other-, yield to the dictates of humanity on this particular question. Sir William Scott, it is ax-gued at the bar, has, by a series of decisions, developed the px-inciples of national law on this subject, with a pex-spicuity and precision which mark plainly the path we ought to tx-ead.
*I respect Sir William Scott, as I do every truly great man; pono and I respect his decisions ; nor .should I depax-t from them on light *- grounds : but it is impossible to consider them attentively, without perceiving that his mind leans strongly in favor of the captors. Residence, for example, in a belligerent country, will condemn the» shax-e of a neutral in a ■ house, trading in a neutral country; but residence in a neutx-al country will not px-otect the shax-e of a belligerent or neutral in a commex-cial house established in a belligerent country. In a great maritime country, depending on its navy for its glory and its safety, the national bias is, perhaps, so entirely in this direction, that the judge, without being conscious of the fact, must feel its influence. However this may be, it is a fact of which I am fully convinced; and on this account, it appeax-s to me, to be the more proper to investigate rigidly the principles on which his decisions have been made, and not to extend them where such extension may produce injustice. While I make this obsex-vation, it would betx-ay a want of candor, not to accompany it with the acknowledgment, that I perceive in the opinions of this eminent judge, no disposition to press this principle with peculiar severity against neutrals. He has certainly not mitigated it when applying it to British subjects.
With this impx-ession respecting the general character of Bx-itish admiralty decisions, I proceed to examine them so far as they bear on the question of domicil. The case of The Vigilantia does not itself involve the point. But in delivering his opinion, the judge cited two cases of capture which have been quoted and relied on at bax\ In each of these, the share * of the partner residing in the neutral country, was restored, and that of the *191 partner residing in the belligerent country was condemned. But these decisions applied to a trade continued to be carried on during war.
In a' subsequent case, the share of the partner residing in the neutral country also was condemned; and the lords commissioners said, that the principle on which restitution was decreed in each of the first-mentioned *„00-| cases, was, “ that they were merely at the commencement *of a war.” J They said, that “ a person carrying on trade habitually in the country of the enemy, though not resident there, should have time to withdraw himself from that commerce ; that it would press too heavily on neutrals, to say, that, immediately, on the first breaking out of a war, their goods would become subject to confiscation.”
On these cases,.it is to be observed, that although the first two happened at the commencement of the war, yet they happened during a war ; and the partners whose interest was condemned, do not appear to have discontinued their residence and trading in the country of the enemy, after war had taken lilace. The declaration “ that it would press too heavily on neutrals, to say, that, immediately on the first breaking out of a war, their goods would become subject to confiscation,” though applied to a neutral not residing in the belligerent country, clearly discriminates, in a cáse of capture, between the rights of parties, at the commencement of a war, and at a subsequent period. But it is sufficient to say, that neither the case itself, nor the cases and opinions cited in it, apply directly' to the question before this court.
In the case of The Harmony, the property of Mr. Murray, an American citizen, residing in France, was condemned on account- of that residence. But Mr. Murray had removed to France, during the war, and had continued there for four years. The scope of the argument of Sir William Scott goes to show, that the single circumstance of residence in the enemy country, if not intended to be permanent, will not give the enemy character to the property of such resident, captured in a trade between his own country and that of the enemy. It is material, that the conduct of Mr. Murray, subsequent to the capture, had great influence in determining the fate of his property. Had he returned to the United States, immediately after that event, I do not hazard much, in saying that restitution would have been decreed.
In the case of The Indian Chief, Mr. Johnson, an American citizen *3011 domiciliated in England, had engaged *in a mercantile enterprise to J the British East Indies — a trade allowed to an American citizen, but prohibited to a British subject. On its return, the vessel came into Cowes, and was seized for being concerned in illicit trade. Mr. Johnson had then left England for the United States. He was considered as not being a British subject, at the time of capture, and restitution was decreed. In delivering- his opinion in this case, Sir William Scott said, “ Taking it to be clear, that the national character of Mr. Johnson, as a British merchant, was founded in residence only, that it was acquired by residence, and rested on that circumstance alone, it must be held, that, from the moment he turns his back on the country where he has resided, on his way to his own country, he was in the act of resuming his original character, and is to be considered as an American. The character that is gained by residence, ceases by non-residence. It is an adventitious character, that no longer adheres to him, from the moment that he puts himself in motion, bondfide, to quit the con ntry *192 sine animo revertendV This case undoubtedly proves, affirmatively, that the national character gained by residence ceases with that residence ; but I cannot admit it, to prove, negatively, that this national character can be laid down by no other mems. I cannot, for instance, admit that an American citizen, who had gained a domicil in England, during peace, and was desirous of returning home, on the breaking out of war, but was detained by force, could, under the authority of this opinion, be treated as a British trader, with respect to his property embarked before a knowledge of the Avar.
In the case of La Virginie, the property of a Mr. Lapierre, who was probably naturalized in the United States, but who had returned to St. Domingo, and had shipped the produce of that island to France, was condemned. But he was considered as a Frenchman, was residing at the time in a French colony, and Avas engaged in a trade between that colony and the mother country. The case, the judge observed, might have been otherwise decided, had the shipment been made to the United States.
*In the case of The Jonge Klassina, Mr. Ravie had a license to r*o02 make certain importations, as a British subject. He had á house in L Amsterdam, went there in person, during the Avar, and made the shipment, under his own inspection and control. It was determined, that, in this transaction, he acted in his character as a Dutch merchant, and was not protected by his license. This was a trading during war.
In the case of The Citto, the property of Mr. Bowden, a British subject residing’ in Holland, was condemned. It appeared, that he had settled in Amsterdam, Avhere he' had resided, carrying on trade, for six years. In 1795, Avhen the French troops took possession of that country, he left it and settled in Guernsey. The Citto was a Danish vessel, captured in April 1796, on a voyage from a Spanish port to Guernsey, where Mr. Bowden then resided. In June 1796, after the capture of the Citto, he returned to Holland. In argument, it was contended, that it appeared, that British subjects might reside in Holland, without forfeiting their British character, from the proclamation of the 3d of September 1796, which directs the landing of goods, imported under that order into the United Provinces, to be Certified by British merchants resident there. The judge Avas desirous of knowing the nature of Mr Bowden’s residence.in Holland — whether he had confined himself to the object of withdrawing his property, or had been engaged in the general traffic of the place. If the former, “ he may,” said the judge, “ be entitled to restitution; more especially adA'erting to the order in council, which is certainly so worded as not to be very easy to be applied.” The cause stood for further proof. It is plain, that in this opinion, the residence of the claimant at the time of capture was not considered as con' elusive. Had it been so, restitution must have been decreed, because Mr. Bowden was a British subject, and, at that time, resided in Guernsey. It is equally apparent, that, had his subsequent residence in the enemy country been for the sole purpose of withdrawing his property, the law was not understood to forbid restitution. *The language of Sir William r*303 Scott certainly ascribes considerable influence to the proclamation, L but does not rest the right of the claimant altogether on that fact.
On the 17th of March 1800, an affidavit of Mr. Bowden, made the 6th of August 1799, was produced, in which he stated his residence in Holland, *193 previous to the invasion by the French. That he quitted Holland, and landed in England, the 20th of January 1795, whence he proceeded to Guernsey, w.here he resided with his family. That in the month of June 1796, he was under the absolute necessity of returning to Holland, for the purpose of recovering debts due and effects belonging to the partnership, his partner remaining in Guernsey. The affidavit then proceeded to state many instances of his attachment to his own government, and concluded with averring, that he was still under the necessity of remaining in Holland, for the purpose of recoving part of the said debts and effects, which would be impossible, were he to leave the country ; but that it was his intention to return to his native country, so soon as his affair’s would permit, where his mother and his relations reside. The court observed, that it appeared, from the affidavit, that Mr. Bowden was, at that time, in Holland ; and added, “it would be a strange act of injustice, if while we are condemning the goods of persons of all nations resident in Holland, we were to restore the goods of native British subjects resident there. An Englishman residing and trading in Holland, is just as much a Dutch merchant, as a Swede or a Dane would be.”
This case was decided in 1800. Mr. Bowden had returned to Holland in 1796, during the war, and had continued in the country of the enemy. It is not denied, that he continued his trade, and the fact that he did continue it, is fairly to be inferred, not only from his omitting to aver the contrary, but from the language of Sir William Scott. “ An Englishman residing and trading in Holland,” says that judge, “ is just as much a Dutch merchant, as a Swede or a Dane would be.” The case of Mr. Bowden, then, is the ease of a British subject, who continued to reside and trade in the enemy *8fUl countl'U f°lir years after the commencement of hostilities; His -* ^property must have been condemned on one of two principles. Either the judge must have considered his residence in Guernsey, from January 1795, to June 1796, as a temporary interruption of his permanent residence in Holland, and not as a change of dómicil, since he returned to that country, and continued in it, as a trader, to the rendition of the final sentence ; or he must have decided, that although Mr. Bowden remained and intended to remain in fact a British subject, yet the permanent national commercial character which he acquired after this capture, retroacted on a trade which, at the time of cajiture was entirely British, and subjected the property to confiscation. On whichsoever of these principles the case was decided, it is clear, that the hostile character attached to the property of Mr. Bowden, in consequence of his residing and trading in the country of the enemy during the war. This case is, I think, materially variant from one in which the residence and trading took place during peace, and the capture was made before a change of residence could be conveniently effected.
The Diana is also a case of considerable interest, which contains doctrines entitled to attentive consideration. During the war between Great Britain arid Holland, which commenced in 1795, the island of Demarara surrendered to the British arms. By the treaty of Amiens, it was restored to the Dutch. That treaty contained an article allowing the inhabitants, of whatever country they might be, a term of three years, to be computed from [1] the notification of the treaty, for the purpose of disposing of their property acquired and possessed before or during the war, in which, term they may *194 have the full exercise of their religion and enjoyment of their property. Previous to the declaration of war against Holland, in 1803, the Diana and several other vessels, loaded with colonial produce, were captured on a voyage from Demarara to Holland. Immediately after the declaration of war, and before the expiration of three years from the notification of the treaty of Amiens, Demarara again surrendered to Great Britain. Claims to the captured *property were filed by original British subjects, inhabitants of Demarara, some of whom had settled in the colony, while it was L in possession of Great Britain, others before that event. The trial came on, after the island had again become a British colony.
Sir William Scott decreed restitution to those British subjects who had settled in the colony, while in British possession, but condemned the property of those who had settled there, before that time. He held, that their settling in Demarara, while belonging to Great Britain, afforded a .presumption of their intending to return, if the island should be transferred to a foreign power ; which presumption, recognised in the treaty, relieved those claimants from the necessity of proving such intention. He thought it highly reasonable, that they should be admitted to their jus postliminii, and be held entitled to the protection of British subjects. But the property of those claimants who had settled before it came to the possession of Great Britain, was condemned. “Having settled without any faith in British possession, it cannot be supposed,” he said, “ that they would have relinquished their residence, because that possession had ceased. They had passed from one sovereignty to another with indifference ; and if they may be supposed to have looked again to a connection with this country, they must have viewed it as a circumstance that was in no degree likely to affect their intention of continuing there.” “ On the situation of persons settled there, previous to the time of British possession, I feel myself,” said the judge, “ obliged to pronounce that they must be considered in the same light as persons resident in Amsterdam. It must be understood, however, that if there were among these, any who have been actually removing, and that fact is properly ascertained, their goods may be capable of restitution. All that I mean to express is, that there must be evidence of an intention to remove, on the part of those who settled prior to British possession, the presumption not being in their favor.” This having been a hostile seizure, though made before the declaration of war, the property is held r*30g equally *liable to condemnation as if captured the instant of that L declaration.
So much of the case as relates to those claimants who had settled during British possession, proves that other circumstances than an actual getting into motion for the purpose of returning to his own country, may create a presumption of intending to return ; and may put off that hostile commercial character which a British subject residing and trading in the country of an enemy, is admitted to acquire. The settlement having been made in a country which, at the time, was in possession of Great Britain, though held only by the right of conquest — a tenure known to be extremely precarious, and rarely to continue longer than the war in which the acquisition is made, is sufficient to create this presumption ; but the case does not declare negatively, that no other circumstances would be sufficient,
I am aware, that the part of the case which applies to claimants who had *195 *3(U] settled previous to British possession, will, at first view, appear to have a strong bearing on the question before the court. The shipment was in time of peace, and the seizure was made before the declaration of war. The trade was one in which a British subject, in time of peace, might lawfully engage. However strong his intention might be, to return to his native country, in the event of war, he could not be expected to manifest that intention, before the actual existence of war. The re-conquest of the island followed the declaration of war so speedily, as scarcely to leave time for putting in execution the resolution to return, had one been formed. Taking these circumstances into view, the condemnation would seem to be one of extreme severity. Yet, even this case, amitting the decision to be perfectly correct, does not, I think, when accurately examined, go so far as to justify a condemnation under such circumstances as belong to some of the cases at bai\ The island having surrendered, during war, such of its inhabitants as were originally British subjects were not allowed to derive, from this re-annexation to the dominions of Great Britain, the advantages to which a voluntary return to their own country, of the same 'Mate, would have entitled them. They were considered as if they had been “ residents of Amsterdam.”
But Sir William Scott observes, that “if there are among these any who have been actually removing, and that fact is properly ascertained, their goods may be capable of restitution.” “ Actually removing ” — when ? Not, surely, before the seizure ; for that was made in time of peace. Not before the declaration of war, when the original seizure was converted into a belligerent capture ; for until that declaration was known, a person whose intention to remain or return was dependent on peace or war, would not be “actually removing.” On every principle of equity, then, the time to which these expressions refer, must be the surrender of Demarara, or a reasonable time after the declaration of war was known there. The one period or the other would be subsequent to that event which was deemed equivalent to capture. It is not unworthy of remark, that Sir William Scott adds explanatory words, which qualify and control the words “ actually removing,” and show the sense in which he used them. “ All,” says the judge, “ that I mean to express is, that there must be evidence of an intention to remove, on the part of those who settled prior to British possession, the presumption not being in their favor.” It would, then, I think, be rejecting a part, and a material part, of the opinion, to say, that an intention to remove, clearly proved, though not accompanied by the fact of removal, would have been deemed insufficient to support the claim for restitution.
Were there no other circumstances of real importance in this case — did it rest solely on the sentiments expressed by the judge, unconnected with those circumstances, I should certainly consider it as leaving open to the claimants before this court, the right of proving an intention to return, within a reasonable time after the declaration of war, by other overt acts than an actual removal. But there are other circumstances which I cannot *3081 *^eertl immaterial; and as the opinions of a judge are always to be J taken with reference to the particular case in which they are delivered, I must consider these expressions in connection with the whole case.
The probability is, that the claimants were not merely British merchants. Though the fact is not expressly stated, there is some reason to believe, that *196 they had become proprietors of the soil, and were completely incorporated with the Dutch colonists. They are not denominated merchants ; they are spoken of, through the case, not as residents, but as settlers. “They had passed,” said Sir William Scott, “from one sovereignty to another, with indifference.” This mode of expression appears to me to indicate a more permanent interest in the country — a more intimate connection with it than is acquired by a merchant removing to a foreign country, and residing there in time of peace, for the sole purpose of trade. And in another of the same class of cases, it is said, that, previous to the last war, the principal plantations of the island were in possession of British planters, from the other British islands. The voyage, too, in making which the Diana was captured, was a direct voyage between the colony.'and the mother country. The trade was completely Dutch ; and the property of any neutral, wherever residing, if captured in such a voyage, during war, would be condemned. But it is still more material, that those who settled in Demarara, before British possession, must have settled during the war which was terminated by the treaty of Amiens ; or, if they settled in time of peace, must have continued there, while the colony was Dutch, and while Holland was at war with Great Britain. Whichever the fact might be, whether they had settled in an enemy country during war, or had continued, through the war, a settlement made in time of peace, they had demonstrated that war made no change in their residence. In their case, then, it might be correctly said, “ that war created no presumption of an intention to return ” — “ that they passed from one sovereignty to another with indifference.” *1 cannot consider claims, under these r*o0g circumstances, as being in the same equity with claims made by per- L sons who had removed into a foreign country, in time of peace, for the sole purpose of trade, and whose tracle would be annihilated by war.
The case of The Boedes Lust differs from The Diana only in this : the claimants are not alleged to have been originally British subjects. Restitution was asked, because the property did not belong to an enemy, at the time of shipment, nor at the time of seizure, nor at the time of adjudication. These grounds were all declared to be insufficient: the original seizure was provisionally hostile ; and the declaration of war consummated the right to condemn, and vested the property in the crown, as enemy property. The subsequent change in the character of the claimants, who became British subjects, by the surrender of Demarara, could not divest it. “ Where property is taken in a state of hostility,” said Sir William Scott, “the universal practice has ever been, to hold it subject to condemnation, although the claimants may have become friends and subjects, prior to adjudication.” “ With as little effect,” he added, “can it be contended, that apostliminium can be attributed to these parties. Here is no return to the original character, on which only a jus postliminii can be raised. The original character, at the time of seizure, and immediately prior to the hostility which has intervened, was Dutch. The present character, which the events of war have produced, is that of British subjects ; and although the British subject might, under circumstances acquire the jus postliminii, upon the resumption of his native character, it never can be considered, that the same privilege accrues upon the acquisition of a character totally new and foreign.” This opinion is certainly not decisive ; but it appears to me rather to favor than oppose the idea, that a merchant residing abroad, and taking measures to return *197 on the breaking out of war, may entitle himself to the jus postliminii, with respect to property shipped before a knowledge of the war.
The President was captured on a voyage from the *Cape of Good Hope to Europe. Mr. Elmslie, the claimant, was born a British subject, but claimed as a citizen of the United States. He had removed to the Cape of Good Hope, during the preceding war, and still resided there. The property was condemned. In delivering his opinion, Sir William Scott, observed, “ It is said, the claimant is entitled to the benefit of an intention of removing to Philadelphia, in a few months. A mere intention to remove, has never been held sufficient, without some overt act, being merely an intention residing secretly and undistinguishably in the breast of the party, and liable to be revoked every hour. The expressions of the letter in which this intention is said to be found, are, I observe, very weak and general, of an intention merely in futuro. Were they even much stronger than they are, they would not be sufficient. Something more than mere verbal declaration, some solid fact, showing that the party is in the act of withdrawing, has always been held necessary in such cases.”
It is to be held in mind, that this opinion is delivered in the case of a person who had fixed his residence in an enemy country, during war, and that he claimed to be the subject óf a neutral state. For both these reasons, the war afforded no presumption of his intending to return, either to his native or adopted country. To the vague expression of an intention to return, at some future indefinite time, no influence can be ascribed. When the judge says that “something more than mere verbal declaration, some solid fact, showing that the party is in the act of withdrawing, has always been held necessary in such cases,” I do not understand him to say, that the person must have put himself in personal motion to return, must have commenced his voyage homeward, in order to be considered as in “ the act of .withdrawing.” Many other overt acts, as selling a commercial establishment, stopping business, making preparations to return, accompanied by declarations of the intent, and not opposed by other. circumstances, may, in my opinion, be considered as acts of withdrawing.
In the case of The Ocean, Sir William Scott said, “ This claim relates *311] to the situation of British subjects, settled *in a foreign state, in time of amity, and taking early measures to withdraw themselves, on the breaking out of war. The affidavit of claim states, that this gentleman had been settled, as a partner in a house of trade, in Holland, but that he had made arrangements for the dissolution of the partnership, and was only prevented from removing personally, by the violent detention, of all British subjects, who happened to be within the territories of the enemy, at the breaking out of the war. It would, I think, under these circumstances, be going further than the principle of law requires, to conclude this person, by his former occupation, and by his present constrained residence in France, so as not to admit him to have taken himself out of the effect of supervening hostilities, by the means which he had used for his removal.”
If other means for removal were taken, than arrangements for the dissolution of the partnership, they are not stated ; and it is fairly to be presumed, that these arrangements were the most prominent of them, since that fact is alone selected and particularly relied upon. In his statement of the case, the reporter says, that the claimant had actually made his escape *198 and returned to England, in July 1803 (the trial was in January 1804) ; but this must be a mistake, or is a fact not adverted to by the judge, since he says, in his opinion, that the claimant is, at the time, “a constrained resident of France.”
I shall notice two other cases which are frequently cited, though 1 have seen no full report of either of them. The first is the case of Mr. Curtissos. This gentleman, who was a British subject, had gone to Surinam in 1766, and from thence to St. Eustatius, where he remained until 1776. He then went to Holland, to settle his accounts, and with an intention, “ as was said,” of returning afterwards to England to take up his final residence. In December 1780, orders of reprisal were issued by England against Holland. On the first of January 1.781, The Snelle Zeylder was captured, and, on the 5th of March and 10th of April 1781, the vessel and her cargo were condemned as Dutch property. On *the 27th of April 1781, Mr. r*g-¡2 Curtissos returned to England : and on an appeal, the sentence of L condemnation was reversed by the lords of appeals, and restitution decreed. Other claims of Mr. Curtissos were brought before the court of admiralty ; and, on a full disclosure of these circumstances, restitution was deereed, before the decree of the lords in the case of The Snelle Zeylder was pronounced. (3 Rob. 25.) The principle of this decree is said to be, that Mr. Curtissos was in itinere, and had put himself in motion, and was in pursuit of his original British character.
I do not mean to find fault with this decision ; but certainly it presents some strong points more unfavorable to the claimant than will be found in some of the cases now before this Court. Mr. Curtissos had obtained a commercial domicil in the country of the enemy. At the time of the sailing, capture and condemnation of the Snelle Zeylder, he still resided in the country of the enemy. But it is said, he was in itinere ; he was in motion in pursuit of his original British character. What was this joitrney, he is said to have been performing in pursuit of his original character ? He had passed from one part of the dominions of the United Provinces to another. He had moved his residence from St. Eustatius to Holland, where he remained from the year 1776 until 1781 — a time of sufficient duration for the acquisition of a domicil, had he not previously acquired it. This change of residence, to make the most of it, is an act too equivocal in itself to afford a strong presumption that it was made for the purpose of returning to England. Had his stay in Holland even been short, a colonial merchant trading to the mother country, may so frequently be carried there on the business of his trade, that the fact can afford but weak evidence of an intention to discontinue that trade: but an interval of between four and five years elapsed between his arrival in Holland and his departure from that country, during which time he is not stated to have suspended his commercial pursuits, or to have made any arrangements, such as transferring his property to England, or making an establishment there, which might indicate, . 3 *by overt acts, the intention of returning to his native country. This L journey to Holland, connected with this long residence, would seem to me, to be made as a Dutch merchant, for the purpose of establishing himself there, rather than as preparatory to his return to England. But it was said, that he intended to return to England. How was this intention shown ? If not by his journey to Holland and his long residence there, it was only shown by *199 his being employed in the settlement of his accounts, while a merchant at St. Eustatius, a business in which he would of course engage, whatever his future objects might be. This equivocal act does not appeal’ to have been explained, otherwise than by his own declarations ; nor does it appear that these declarations were made previous to the capture. But could I even admit, that the journey from St. Eustatius to Holland, was made with a view of passing ultimately from Holland to England, yet the intention was not to be immediately executed. The time of carrying it into effect, was remote and uncertain ; subject to so many casualties that, had not the war supervened, it might never have been carried into effect. But laying aside these circumstances, the case proves only, that being in itinere, in pursuit of the native character, divests the enemy character required by residence and trading; it is not insinuated, that this character can be divested by no other means.
Mr. Whitehill’s case, though one of great severity, does not, I think, overturn the principle I am endeavoring to sustain. He went to St. Eustatius, but a few days before Admiral Rodney and the British forces made their appearance before that place. But it was proved, that he went for the purpose of making a permanent settlement there ; no intention to return appears to have been alleged. The recency of his establishment seems to have been the point on which his claim rested. This case, in principle, bears on that before the court, so far only as it proves that war does not, under all circumstances, necessarily furnish a presumption, that the foreigner residing in the enemy country, intends to return to his own. The circumstances of this *314-1 *caseJ so far as we understand them, were opposed to the presumpJ tion that war could affect Mr. Whitehill’s residence. War actually existed at the time of his removal; and had that fact been known to him, there would have been no hardship in his case. He would have voluntarily taken upon himself the enemy character, at the same time that he took upon himself the Dutch character. There is reason to believe that the court considered him in equal fault with a person removing to a country known to be hostile. St. Eustatius was deeply engaged in the American trade, which, from the character of the contest, was, at that time, considered by England as cause of war, and was the fact which drew on that island the vengeance of Britain. Mr Whitehill could have fixed himself there only for the purpose of prosecuting that trade, “die went,” says Sir William Scott, “ to a place which had rendered itself particularly obnoxious by its conduct in that war.” This was certainly a circumstance which could not be disregarded, in deciding on the probability of his intending to remain in the country, in the event of war.
These are the cases which appear to me to apply most Strongly to the question before this court. No one of them decides, in terms, that the property of a British subject, residing abroad, in time of amity, which was shipped, before a knowledge of war, and captured by a British cruizer, shall depend, conclusively, on the residence of the claimant at the time of capture, or on his having, at that time, put himself in motion to change his residence. In no case which I have had an opportunity of inspecting, have I seen a dictum to this effect. The cases certainly require an intention, on the part of the subject residing and trading abroad, to return to his own country, and that this intention should be manifested by overt acts; but *200 they do not, according to my understanding of them, prescribe any particular overt act, as being exclusively admissible ; nor do they render it indispensable that the overt act should, in all cases, precede the capture. If a British subject, residing abroad for commercial purposes, takes decided measures, on the breaking out of war, for returning to his native country, and especially, if he should actually return, his claim for the restitution of property, shipped before his knowledge of *the war, would, I think, r*31g bo favorably received in a British court of admiralty, although his L actual return, or the measures proving his intention to return, wore subsequent to the capture. Thus understanding the English authorities, I do not consider them as opposing the principle I have laid down.
An American citizen, having merely a commercial domicil in a foreign country, is not, I think, under the British authorities, concluded, by his residence and trading in time of peace, from averring and proving an intention to change his domicil on the breaking out of war, or from availing himself of that proof in a court of admiralty. The intrinsic evidence arising from the change in his situation, produced by war, renders it extremely probable, that in this new state of things, he must intend to return home, and will aid in the construction of any overt act by which such intention is manifested. Dissolution of partnership, discontinuance of trade in the enemy country, a settlement of accounts, and other arrangements obviously preparatory to a change of residence, are, in my opinion, such overt acts as may, under circumstances showing them to be made in good faith, entitle the claimant to restitution.
I do not perceive the mischief or inconvenience that can result from the establishment of this principle. Its operation is confined to property shipped before a knowledge of the war. For if shipped afterwards, it is clearly liable to condemnation, unless it be protected by the principle that it is merely a withdrawing of funds. Being confined to shipments made before a knowledge of the war, the evidence of an intention to change or continue a residence in the country of the enemy, must be speedily given. A continuance of trade, after the war, unless, perhaps, under very special circumstances, and for the mere purpose of closing transactions already commenced, would fix the national character and the domicil previously acquired. An immediate discontinuance of trade, and arrangements for removing, followed by actual removal, within a reasonable time, unless detained by causes which might sufficiently account for not removing, would fix the intention to change the domicil, and show that the intention to return had never been abandoned ; that the intention to remain always had never *been formed. It is a case, in which, if in any that can r*3jg be imagined, justice requires that the citizen, having entirely recov- *• ered his national character by his own act, and by an act which shows that he never intended to part with it finally, should, by a species of the jus postliminii, be allowed to aver the existence of that character, at the instant of capture. In the establishment of such a principle, I repeat, I can perceive no danger. In its rejection, I think, I perceive much injustice. An individual whose residence abroad is certainly innocent and lawful, perhaps, advantageous to his country, who never intended that residence to be permanent, or to continue in time of war, finds himself, against his will, clothed with the character of an enemy, so conclusively, that not even a *201 return to his native country can rescue from that character and from confiscation, property shipped in the time of real or supposed peace. My sense of justice revolts from such a principle.
In applying this opinion to the claimants before the court, I should be regulated by their conduct, after a knowledge of the war. If they continued their residence and trade, after that knowledge, at any rate, after knowing that the repeal of the orders in council was not immediately followed by peace, their claim to restitution would be clearly unsustainable. If they took immediate measures for returning to this country, and have since actually returned, or have assigned sufficient reasons for not returning, their projierty, I think, may be capable of restitution. Some of the claimants would come within one description, some within the other. It would, under the opinion given by the court, be equally tedious and useless to go through their cases.
My reasoning has been applied entirely to the case of native Americans. This course has been pursued for two reasons. It presents the argument in what I think its true light; and the sentence of condemnation makes no discrimination between native or other citizens. The claimants arc natives of that country with which we are at war, who have been naturalized in the United States. It is imposible to deny, that many of the strongest arguments urged to prove the probability that war must determine h-i the native American citizen to abandon *the country of the enemy J and return home, are inapplicable, or apply but feebly, to citizens of this description. Yet, I think, it is not for the United States, in such a caso as this, to discriminate between them. I will not pretend to say, what distinctions may or may not exist between these two classes of citizens, in a contest of a different description. But in a contest between the United States and the naturalized citizen, in a claim set up by the United States to confiscate his property, he may, I think, protect himself by any defence which would protect a native American. In the prosecution of such a claim, the United States are, I think, if I may be excused from borrowing from the common law a term peculiarly appropriate, estopped from saying that they have not placed this adopted son on a level with those born in their family.
Livingston, J., concurred in the opinion with the Chief Justice.